

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ANTONIA FRANCK, )
        Plaintiff, )
v. ) No. 05 C 3640
FARMERS NEW WORLD LIFE )
INSURANCE COMPANY, )
        Defendant. )

## MEMORANDUM OPINION AND ORDER

Prior to his sudden death on February 17, 2004, Mark Franck ("Mr. Franck") consulted with an insurance agent about purchasing a life insurance policy. He applied for a policy and the insurance company subsequently issued a policy and sent it to the agent, but Mr. Franck passed away a few hours before the agent called to arrange to deliver the policy to him. Mark Franck's widow, Antonia Franck ("Mrs. Franck"), the primary beneficiary of that policy, believes that her husband had an enforceable policy with defendant Farmers New World Life Insurance Company ("Farmers"), part of the Farmers Insurance Group ("Farmers Group"), and seeks a declaratory judgment that she is owed the death benefit for which that policy provided. Both parties have brought motions for summary judgment. Because, taking the facts in the light most favorable to Mrs. Franck, a finder of fact would be unable to conclude that any policy Farmers issued to Mr. Franck went into effect prior to his death, I deny Mrs. Franck's motion for summary judgment and grant Farmers' motion.

I.

Summary judgment is appropriate where the record and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999); FED. R. CIV. P. 56(c). I must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

II.

The parties generally agree on the facts relevant to their cross-motions, although they disagree on the legal significance of those facts.[1] Prior to applying for life insurance with Farmers, Mr. Franck had automotive and fire insurance policies with a related Farmers Group entity. Because of that prior relationship with the Farmers Group, Mr. Franck received a letter telling him about Farmers life insurance policies and inviting him to speak with his Farmers Group automotive and fire insurance agent, Gene

---

[1] Both parties have technical deficiencies in their responses to each others' statements of material facts. Mrs. Franck only belatedly submitted a response to Farmers' statement of material facts, although she also did substantially address those facts in her response to Farmers' motion and in her own statement of material facts. Farmers did provide a response to Mrs. Franck's statement of material facts but did not provide specific references to affidavits, parts of the record or other materials as required by Local Rule 56.1. Given that both sides have deficiencies in their responses, I have reviewed the record in its entirety to confirm the truly undisputed facts.

2

Radwanski ("Radwanski"), about life insurance. Radwanski operated an independent insurance agency, Radwanski Insurance Agency, Inc. He had an ongoing relationship with Farmers and testified that while 97% of his insurance business was with Farmers, he could broker business with other insurers if Farmers did not write the desired policy. He testified that he had previously placed one life insurance policy with another insurer after Farmers declined to insure that individual.

On March 1, 2003, Mr. Franck left a note under Radwanski's office door asking him to obtain a quote for a $500,000 benefit, 10-year level term life insurance policy for him. Radwanski obtained the quotes and sent them to Mr. Franck a few days later. Radwanski did not hear from Mr. Franck for several months, and in September of 2003 sent him another insurance solicitation letter. On September 16, 2003, Mr. Franck again left a note under Radwanski's door stating, in part, "Gene enclosed plz find ck of $300 for (approx amt) 6 mo of life insurance for me (49 years old) $500,000. Plz start insurance now[.] Call for phyz. apt." This note was written on a chart from Farmers listing rates for a "Premier Non-Nicotine Level Term Policy" and included handwritten notes circling specific premier premium rates listed on the chart.[2]

---

[2]Farmers has four different levels of rates for its life insurance policies that depend on various underwriting factors (including, for instance, the health of the insured). Those categories of rates, from lowest to highest, are premier, preferred, standard, and "standard plus a rating." Radwanski

3

After receiving this note, Radwanski contacted Mr. Franck and told him that he needed to complete an application and that "the premium that he submitted [was] subject to underwriting." Radwanski then filled out a portion of a Farmers life insurance application (the "first application") for Mr. Franck and sent it to him, and Mr. Franck completed additional information, signed the application, and returned it to Radwanski. The application was for plan name "10 yr level level 2000" [sic] policy in the amount of $500,000. Radwanski issued Mr. Franck a "Temporary Insurance Agreement" which the parties agree provided Mr. Franck with $50,000 in temporary life insurance coverage pending the outcome of his application. Radwanski then arranged for a physical examination provider to contact Mr. Franck to set up an appointment, but that provider and Radwanski were unable to reach him. As a result,

---

testified that he did not recall discussing ratings issues with Mr. Franck, but he acknowledged that Mr. Franck was seeking the cheapest rates possible. Mrs. Franck points out that there is no evidence that Mr. Franck would have declined the policy if he had known he would be subject to higher rates. Further, Radwanski testified that it was his practice "for the most part" to discuss Farmers' rate structure with potential insureds so that they were aware of the structure. Radwanski testified,

> I tell them this is the potential rate depending upon medical records and paramed results, that we – no one knows until it's done. This is the potential rate, if not, the . . . underwriting will come back with a proposed premium, and if you want it, you sign for it. You sign for it, the policy is then issued, and if you accept it after underwriting rates it or determines the premium.

4

Farmers sent Mr. Franck a letter on November 20, 2003, informing him that his first application was closed because it had not received his underwriting information, specifically the physical examination results, within the underwriting period. The letter informed Mr. Franck he could re-open his application if he provided the information within 15 days, and also informed him that it was terminating the Temporary Insurance Agreement.

Mr. Franck did not provide the information within 15 days. In December of 2003 he finally met with Radwanski and scheduled an appointment for a physical examination, which took place on December 30, 2003. Mrs. Franck testified that when Mr. Franck returned home from the physical examination, he told her, "I passed the physical. We're all set."

About three weeks later, on January 22, 2004, Radwanski completed a second life insurance application (the "second application") for Mr. Franck. Radwanski testified that he believed this application "reopened" the first application, and was "part of the same process."[3] This application was for plan name "Level 2000" in the amount of $500,000. However, in completing that application Radwanski mistakenly copied the wrong "plan code," a number which corresponds to a particular policy type. The plan

---

[3] Radwanski noted in his deposition that the second application references the policy number of the first application and that the policy that was eventually issued (but not delivered) had the same policy number as the first application.

5

code that Radwanski entered corresponded to a term life policy with a 20 year level term life insurance benefit, rather than the ten year level term life insurance benefit listed on Mr. Franck's first life insurance application.[4] Radwanski then had Mr. Franck sign this incorrect application. Both parties agree that Radwanski then sent in the application along with a check from Mr. Franck for $350, although Radwanski testified that he believed he attached $300 and could not recall obtaining a second check from Mr. Franck. He testified he may have attached a refund check from the first application rather than a new check from Mr. Franck. The policy reflects that the "cash collected" for the policy was $350.[5]

The same day that Radwanski sent in Mr. Franck's life

---

[4]The parties do not dispute that Mr. Franck wanted a policy with a ten-year term.

[5]Neither party provides any explanation for why Mr. Franck submitted his original check for $300 or why he may have provided a second check for $350. Mr. Franck's initial note to Radwanski suggests he provided $300 because it represented approximately 6 months' worth of premium payments for the policy he wanted. Farmers argues that a premium payment is not necessary in order to initiate an application, although its Temporary Insurance Agreement states that a payment of 1/12 of the "minimum first year's premium" is necessary in order to have that agreement in place pending the outcome of the application. Radwanski also testified that "Farmers prefers a monthly bank check plan. So I need one month's premium and a bank authorization signed, that is the preferred method." He further testified that if a client did not want to submit a bank authorization, he usually asked them to put down an the amount of an annual premium. But there is no evidence Radwanski said anything to Mr. Franck about any type of premium payment. Radwanski testified that it was his "understanding based on [Mr. Franck's] original note slid under the door that he wanted to do a six-month payment basis."

6

insurance application, he provided Mr. Franck with another "Temporary Insurance Agreement" that provided $50,000 in coverage pending the outcome of the underwriting process. The agreement included a "disclosure statement" which provided, in part, "We appreciate your Application for insurance with Farmers New World Life, and want to assure you that your request will receive the most prompt and favorable consideration possible."

By February 10, 2004, the parties agree that Farmers had concluded that Mr. Franck met the underwriting criteria for the policy for which he applied, but not at his desired premiums rate. Farmers maintained a computer database to which Radwanski had access from his office that allowed him to review the status of pending life insurance applications. On February 10 when he checked the database, he noticed that the system reflected that Mr. Franck had applied for a twenty-year policy term rather than the ten-year policy term that Mr. Franck wanted. This reflected the mistake Radwanski had made in putting an incorrect policy code on the second application. Radwanski testified that he could not recall at the time he checked the system whether it showed that Farmers had accepted Mr. Franck's application.

On February 11, Radwanski faxed Farmers a corrected application reflecting the correct policy code for a ten-year policy (the "February 11 facsimile"). The facsimile cover sheet

drew Farmers' attention to the fact that the policy code was incorrect. Attached to that facsimile cover sheet was a document labeled "A Life Insurance Illustration" which illustrated a ten year level term policy at a preferred premium level in the amount of $500,000. The illustration indicated it was designed for Mr. Franck, and contained signature lines indicating it was signed by the "Policyowner" and "Agent" on February 9, 2004. It listed an "initial planned premium outlay" of $380 per semester with semi-annual premium payment frequency.

The same day Radwanski faxed Farmers, Farmers sent Radwanski a letter that Radwanski referred to as a "waiting delivery requirement message" listing Mr. Franck as a proposed insured for a policy (the "February 11 letter"). The letter stated:

> THIS POLICY IS READY FOR DELIVERY. IT WILL NOT BE IN FORCE UNTIL DELIVERY REQUIREMENTS ARE RECEIVED. IF AN ERROR IS DISCOVERED, PLEASE RETURN THE POLICY FOR CORRECTION (FOR EXAMPLE IF THE NAME IS SPELLED INCORRECTLY). PLEASE COMPLETE ANY NECESSARY DELIVERY REQUIREMENTS AND SUBMIT WITHIN 20 DAYS FROM THE DATE OF THIS CORRESPONDENCE.

The letter further stated for Radwanski to "PLEASE COLLECT $2549.00" as well as to have Mr. Franck sign an attached sales illustration. Finally, the letter noted that the policy was issued "WITH STANDARD VS PREFERRED RATES DUE TO BUILD." It is unclear when the letter arrived at Radwanski's office, but Radwanski testified that he was out of his office from February 12 through

February 16 so he did not see mail received until he returned on February 17.

At some point between February 11 and February 13, Farmers received Radwanski's February 11 facsimile and processed a correction of its proposed policy to reflect a ten-year rather than a twenty-year term. It subsequently sent a letter to Radwanski on February 15 (the "February 15 letter") similar to its February 11 letter that reflected that correction. Included with that letter was a "Policy Acceptance" form, a revised life insurance illustration, and a proposed policy with a 10 year level term life insurance benefit at a standard premium. The "Policy Acceptance" form stated:

> NOTE: THIS POLICY IS NOT IN FORCE UNTIL THE PROPOSED INSUREDS (AND PROPOSED OWNERS IF OTHER THAN PROPORSED [sic] INSURED'S) SIGNATURE IS OBTAINED ON THE POLICY ACCEPTANCE FORM. SIGN BOTH COPIES, RETURN A PROPERLY SIGNED COPY TO [Farmers] AND ATTACH THE SECOND COPY TO THE POLICY WHEN SIGNED, THIS AMENDMENT CONSTITUTES A PART OF THE INSURANCE CONTRACT.

It also provided for a "semi-annual premium mode" of $663.00, and directed Radwanski to collect $313.

Radwanski is not certain when this letter arrived, but he saw it for the first time when he arrived back at his office on February 17. Radwanski called the Franck home that afternoon and spoke with Mrs. Franck. She informed him that her husband had passed away. At that time, Radwanski told her about the temporary insurance agreement.

9

Mrs. Franck subsequently filed a claim with Farmers for the life insurance policy that she believed her husband had with Farmers. After Farmers denied her claim and the parties conferred, Mrs. Franck filed a declaratory judgment action in Illinois state court seeking a declaration that she is owed a $500,000 death benefit on that policy. Farmers subsequently removed the case to this court. None of the documents that Mr. Franck signed or completed as part of his first or second insurance applications specifically stated when the policy would go into force or what would occur after Mr. Franck submitted his application. None of these documents stated that the policy would become effective only upon delivery to the insured, or that the policy would become effective immediately upon issuance. In addition, Radwanski testified that he did not recall telling Mr. Franck that the policy, if approved and issued, would only be effective after being delivered to Mr. Franck and signed by him.[6]

Radwanski further testified that Farmers' procedures with respect to issuance of policies are as follows: in order for a policy to become effective, the insured had to "sign for the rate that was proposed by the insurance company and remit any additional

---

[6] Farmers did admit that the Temporary Insurance Agreement stated that temporary coverage ended when "the life insurance policy applied for has been issued" or "the Primary Proposed Insured receives notice that this has been declined." Radwanski also testified that although he did not recall what he told Mr. Franck, it was his practice to inform insurance applicants of the same.

10

moneys [owed due to any difference between what the proposed insured paid at the time of application and what the proposed premium rate is determined to be]." Radwanski testified that to "sign for the rate" means either to sign (1) a policy acceptance form or (2) an illustration prior to the proposal by the insured which indicates a premium rate identical to what the proposed premium rate turns out to be.

III.

There is no dispute between the parties that, if Mr. Franck had a valid, enforceable life insurance policy with Farmers, Mrs. Franck was the primary beneficiary of the policy. Therefore, "under Illinois law, when the basic facts are not in dispute, the existence of a contract is a question of law." *Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1102 (7th Cir. 1997). *See also Dresser, Indus. Inc. v. Pyrrhus AG*, 936 F.2d 921, 926 (7th Cir. 1991) ("'[I]ntent in contract law is objective rather than subjective' and, therefore, not a question of fact.") (quoting *Empro Mfg. Co. v. Ball-Co. Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir. 1989)).

To be valid under Illinois law, a contract, such as a life insurance policy, requires an offer, acceptance, and consideration. *Voelker v. Porsche Cars N. Am.*, 353 F.3d 516, 528 (7th Cir. 2003). *See also Halloran v. Dickerson*, 287 Ill. App. 3d 857, 867-68, 679

N.E.2d 774, 782, 223 Ill. Dec. 323, 331 (Ill. App. Ct. 1997). In addition, there must be mutual assent, or a "meeting of the minds," as to the essential terms of the contract. *Acad. Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 30, 578 N.E.2d 981, 984, 161 Ill. Dec. 335, 338 (1991). The Illinois Supreme Court has previously held that a contract of insurance is "established" when "one of the parties to such a contract proposes to be insured and the other party agrees to insure, and the subject, the amount, and the rate of insurance are ascertained or understood and the premium paid if demanded." *Zannini v. Reliance Ins. Co. of Illinois, Inc.*, 147 Ill.2d 437, 454, 590 N.E.2d 457, 464, 168 Ill. Dec. 820, 827 (1992).

Here, taking the facts in the light most favorable to Mrs. Franck, Mr. Franck sent Farmers an application for life insurance with the understanding that Farmers would undertake an underwriting analysis to assess whether he qualified for his desired premium rate. Farmers agreed to insure Mr. Franck, but not at the premium rate for which he applied, and Farmers requested a premium payment in order to make the policy effective. Under these circumstances, there is no evidence that the parties had a "meeting of the minds" about the terms of the contract, specifically about the premium rates that Mr. Franck would have to pay. Therefore, Farmers is correct that the policy it issued constituted a counteroffer to Mr.

Franck's application. Mr. Franck needed to accept that offer in order for the policy to become enforceable. *See Zannini*, 147 Ill. 2d at 454, 590 N.E.2d at 464, 168 Ill. Dec. at 827. Pursuant to the clear terms of Farmers' counteroffer, Mr. Franck needed to sign the policy acceptance form and policy illustration and pay an additional $313 toward the semi-annual premium payment of $663 to make the policy effective.[7] Here, because of his unfortunate death, he was never able to accept that offer and perform the requirements set forth by Farmers.

Although there was no meeting of the minds and no acceptance by Mr. Franck, Mrs. Franck argues that Farmers' represented that mere issuance of the policy would render it effective, and that this created at the very least an ambiguity that must be resolved in Mr. Franck's favor, rendering the policy effective no matter the premium rate. *See Stone Container Corp. v. Hartford Steam Boiler Inspection and Ins. Co.*, 165 F.3d 1157, 1161 (7th Cir. 1999). Mrs. Franck points to the language of the policy application and the

---

[7]Mrs. Franck argues that Farmers could not have conditioned acceptance of the policy on payment of the semi-annual premium because this requirement was not disclosed to her husband by Radwanski or in the materials he reviewed and completed in submitting his application. While this requirement was not discussed, there was no indication that an additional payment would not be required. Taking the facts in the light most favorable to Mrs. Franck, the application materials and Radwanski were silent on this point. Farmers' counteroffer in the form of its proposed policy and accompanying materials presented new terms for Mr. Franck to accept or reject. Therefore, in order for the policy to be enforceable, Mr. Franck had to perform the requirements set forth in the terms of the policy.

Temporary Insurance Agreement as representations from Farmers that the policy became effective upon issuance.[8]

The flaw in Mrs. Franck's reasoning, however, is that the documents that her husband reviewed, as well as Radwanski's representations, were silent, rather than conflicting or ambiguous, on the matter of a delivery requirement. Neither the two policy applications that Mr. Franck completed nor the two Temporary Insurance Agreements that Farmers issued to him explain or set forth any specific acts that constitute acceptance of Mr. Franck's application or set forth any specific acts that Mr. Franck needed to perform to "accept" any policy issued by Farmers. They reference some steps in the underwriting process but do not set forth a delivery or premium pre-payment requirement for the policy to be effective. The Temporary Insurance Agreements merely state that temporary coverage will end when "the life insurance policy applied for has been issued" or the insured has received notice that Farmers declined the application. While this language is consistent with a conclusion that the policy issuance constitutes acceptance of the contract, the language specifically refers to the Temporary Insurance Agreement and says nothing about acceptance of the ultimate insurance contract. The case upon which Mrs. Franck relies to argue that there should be no delivery requirement in

---

[8]Mrs. Franck also points to "the express representation" of Radwanski, although the representation to which she refers is his explanation of the terms of the Temporary Insurance Agreement.

14

this case specifically holds that "if the terms have not been agreed upon. . . the contract of insurance will not become binding until such delivery." *Stramaglia v. Conservative Life Ins. Co. of Wheeling, West Virginia*, 319 Ill. App. 20, 27, 48 N.E.2d 719, 722 (Ill. App. Ct. 1943). Here, because the parties had not agreed on a premium rate, the policy did not go into effect.

Mrs. Franck responds that even if the policy's terms required delivery of the policy to Mr. Franck in order for it to be enforceable, delivery of the policy to Radwanski was constructive delivery of the policy to Mr. Franck. She contends that Radwanski was a "dual agent" of Farmers and Mr. Franck because he completed the policy applications and submitted other necessary documents to help Mr. Franck obtain coverage. Under Illinois law, unless the facts clearly show that an intermediary is an agent of the insured, whether an intermediary is an agent for the insurer or the insured is a question of fact. *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 264 (7th Cir. 1986). Illinois courts analyze four factors to determine whether an intermediary is an agent for a party: (1) who first set the intermediary in motion; (2) who could control his action; (3) who was to pay him; (4) and whose interests he was there to protect. *See Krause v. Pekin Life Ins. Co.*, 194 Ill. App. 3d 798, 805, 551 N.E.2d 395, 399, 141 Ill. Dec. 402, 406 (Ill. App. Ct. 1990). Here, taking the facts in the light most favorable to Mrs. Franck, there is evidence that Radwanski was serving as a dual

15

agent for Farmers and Mr. Franck. Mr. Franck first set Radwanski in motion by contacting him to obtain quotes, though he was doing so in response to a letter sent by Farmers advertising its insurance offerings. Mr. Franck had previously used Radwanski as a broker to obtain other Farmers' policies, but Radwanski had an ongoing relationship with Farmers in selling other Farmers' policies. Both Mr. Franck and Farmers could control Radwanski's actions; both gave Radwanski orders to carry out. Radwanski was paid by commissions from Farmers, and not by Radwanski, but did not have a salary from Farmers. Finally, Radwanski acted to protect both parties' interests in the transaction.

Mrs. Franck argues that if Radwanski was serving at least in part as her husband's agent, then delivery of the policy to Radwanski constituted constructive delivery to him. However, Farmers is correct that the doctrine of constructive delivery does not apply when a policy is delivered to the insured's agent "under instructions to turn over the policy to the insured only after compliance with certain conditions." *Massachusetts Mut. Life Ins. Co. v. O'Brien*, 5 F.3d 1117, 1123 (7th Cir. 1993) (internal citation omitted). Here, Farmers sent the policy to Radwanski with instructions to have Mr. Franck sign the policy acceptance form and the illustration and pay an additional premium. Therefore, delivery of the policy to Radwanski was not enough to render the policy effective.

16

For these reasons, even taking the facts in the light most favorable to Mrs. Franck, Mrs. Franck cannot show that her husband had an enforceable life insurance policy with Farmers.

IV.

Mrs. Franck argues in the alternative that even if the policy never became enforceable, Radwanski's errors in entering the wrong plan code on Mr. Franck's first application should estop Farmers from denying the enforceability of the policy. Relatedly, Mrs. Franck contends that Radwanski violated his duty under the policy to give Mr. Franck's application "the most prompt and favorable consideration possible" by not delivering the first policy to Mr. Franck in a timely manner, and therefore should be estopped from asserting that delivery was required in order to render the policy effective.[9]

Prior to her motion for summary judgment (which was filed after Farmers filed its motion for summary judgment), Mrs. Franck had never raised the theory of estoppel or waiver. These theories were not pled in her complaint. Even given the liberal federal notice pleading requirements, Farmers had no notice that Mrs. Franck would raise these claims. A reply to a motion for summary

---

[9]As discussed above, even if the doctrine of constructive delivery operates to prevent Farmers from arguing that the policy needed to be delivered to Mr. Franck to be effective, that is not the only barrier to a determination that there was a valid contract between Farmers and Mr. Franck.

17

judgment is too late to do so. *Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir. 1997).

Even assuming that Mrs. Franck had not waived this argument, however, Mrs. Franck has not shown the necessary elements for estoppel. Equitable estoppel requires a showing that (1) Farmers, through words or conduct, misrepresented or concealed material facts from Mr. Franck; (2) Farmers knew that its representation was untrue; (3) Mr. Franck did not know that the representation was false at the time it was made or acted upon; (4) Farmers intended or expected that Mr. Franck would act upon its representation; (5) Mr. Franck relied or acted upon Farmers' misrepresentation; (6) Mr. Franck's reliance was to his detriment. *See Carl A. Haas Auto. Imports, Inc. v. Lola Cars Ltd.*, 933 F. Supp. 1381, 1391 (N.D. Ill. 1996) (citing *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill.2d 133, 148, 500 N.E.2d 1, 7, 102 Ill. Dec. 379, 385, (1986)). While fraudulent intent is not necessary, the test is "whether in all the circumstances of the case conscience and [the] duty of honest dealing should deny one the right to repudiate the consequences of his representations or conduct." *Id.* (citing *Ceres Illinois*, 114 Ill.2d at 148, 500 N.E.2d at 7, 102 Ill. Dec. at 385). Mrs. Franck must prove the elements of estoppel "by clear and unequivocal evidence." *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill.2d 302, 314, 751 N.E.2d 1150, 1157, 256 Ill. Dec.

18

313, 320(2001). Here, taking the facts in the light most favorable to Franck, Radwanski did not tell Mr. Franck that he made a mistake in the first life insurance application, but Mr. Franck did not act in reliance on any representation this silence created. It is possible that, had Mr. Franck known of the errors, he would have "expedite[d] corrections" and "insure[d] timely delivery of the policy" as Mrs. Franck argues. However, Mrs. Franck has not presented clear and unequivocal evidence that Mr. Franck relied on this misrepresentation to his detriment. Mrs. Franck must show not only that Radwanski made a mistake or violated some duty to Mr. Franck, but that Mr. Franck, if he knew of the mistake, would have acted quickly enough to accept the new policy terms and pay whatever additional premium he owed on the policy.

Mrs. Franck also makes much of the language in the disclosure statement attached to Mr. Franck's applications in which Farmers states that it will give Mr. Franck's application "the most prompt and favorable consideration possible." However, even taking the facts in the light most favorable to her, it is clear that Radwanski's error in entering the plan code on Mr. Franck's second application only led to a four-day delay in processing the policy (since the first policy was issued on February 11, 2004, and the second on February 15, 2004). In addition, as discussed above, from the evidence it is clear that Radwanski was acting at leat in part as Mr. Franck's agent in completing the policy applications;

19

Mrs. Franck herself urges this conclusion. Given this, any mistakes that Radwanski made in completing the policies were not attributable to Farmers.

V.

Because, even taking the facts in the light most favorable to Mrs. Franck, she cannot show that Mr. Franck had an enforceable policy with Farmers, I deny her motion for summary judgment and grant Farmers' motion. This case is therefore dismissed.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: August 4, 2006